Filed 11/24/15  P. v. Woolridge CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B254519 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  NA096294) |
| v. | |
| WILLIAM DEANDRE WOOLRIDGE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James Pierce, Judge.  Affirmed.

Gordon B. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant William Woolridge appeals his conviction of first degree (residential) burglary, contending the trial court committed reversible error by admitting evidence of uncharged misconduct under Evidence Code section 1101, subdivision (b) to establish his identity as the perpetrator of the charged crime. We disagree and affirm the judgment. However, the abstract of judgment must be amended to reflect that the residence was not occupied when it was burglarized.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Information*

Appellant was charged by information with burglarizing a dwelling house on June 4, 2013, in violation of Penal Code section 459.[1] The information alleged that the house was inhabited at the time, but that allegation was stricken by the court during trial. The information further alleged that appellant had been convicted of two prior serious and/or violent felonies as defined by section 667, subd. (d) and 1170.12, subd. (b): a burglary in January 2005 and an attempted burglary in July 2003.

### B. *Pretrial Proceedings*

Prior to trial, the prosecutor moved to admit evidence of an uncharged incident that occurred on June 21, 2013 under Evidence Code section 1101, subdivision (b), to establish appellant's identity as the perpetrator of the June 4, 2013 burglary. In support of the motion, he contended: "In both instances the acts occurred between 8:30 and 8:40 in the morning. They both occurred on weekdays. The both follow[ed] the same pattern. The defendant walked to the front door of a residence in a residential area, . . . just a mile or so from one another . . . , knocked

---

[1]    Undesignated references are to the Penal Code.

2

on the front door loudly, did not receive a response from the homeowner inside, and then went around to the back of the house." The prosecutor also explained that the evidence would show the presence of a blue "Giant" bicycle at the June 4 burglary, that appellant was stopped by police officers while riding a blue Giant bicycle on June 21, and that a GPS (global positioning satellite) monitoring device that appellant, a parolee, was wearing would show his location in the vicinity of the two incidents. In sum, according to the prosecutor, the significant characteristics of the two incidents were "almost identical": "The manner in which the person approached the house, the manner in which [he] attempted to gain access to the house to complete the burglary, the GPS identification of the defendant as the person at both of those locations, the presence of the blue bicycle, the fact that the two locations are separated by less than a mile, the time of day almost down to the minute that both of these incidents occurred, and the fact that they both occurred on weekdays when people are most likely to be at work."

Appellant opposed the motion. His counsel contended Giant was a popular brand of bicycle and that the behavior of the perpetrators during the two incidents was not sufficiently similar. She further asked the court to exclude the evidence under Evidence Code section 352. The court ruled the evidence admissible under Evidence Code section 1101, subdivision (b), and found that the possibility of undue prejudice did not require its exclusion under Evidence Code section 352.

C. *Evidence at Trial*

1. *Prosecution Evidence*

a. *June 4, 2013 Charged Offense*

On the morning of June 4, 2013, Karina Melgarejo was home with her one-year old daughter in the front half of a house on East Marker Lane she and her

3

boyfriend shared with her boyfriend's uncle, Miguel Ramirez, and his family.[2] At 8:30 a.m., she was awakened by a pounding on the front door. Looking out a window, she saw a man she described as either a dark-skinned Hispanic or a light-skinned African-American. She did not see the man's face. A few moments later, Melgarejo saw a man's blue bicycle in front of her door step with the word "Giant" written on it.[3] After approximately five minutes, Melgarejo noticed the bicycle was gone. Melgarejo then saw shadows of people walking toward the back of the house where the Ramirezes lived. She next heard voices and the sound of people moving around and dropping items inside the Ramirez residence. She called 911.[4] When a police officer arrived, at approximately 8:45, there was no one inside the Ramirez residence or the yard, but the residence had been ransacked.

Miguel Ramirez testified that when he left home that morning, his bedroom window was open. When he returned later that morning after being called, he saw that the screen to the window had been removed, and his bedroom was in disarray. Numerous items were missing, including an Xbox, stereo speakers, gold chains, and two containers filled with coins.

The prosecution also introduced a taped conversation between appellant and his girlfriend, Taquasha Speck. Appellant asked Speck if she "[r]emember[ed] that system? The X-box." Speck responded: "The who?" Appellant asked: "You don't got the X-Box no more?" Speck responded: "We got[] a Wii now."

---

[2]     The house was divided into two residences -- one in front and the other in the back -- separated by a locked door and accessible by separate entrances.

[3]     Melgarejo was shown a photograph of a blue Giant bicycle and identified it as the one she had seen that day. The photo was subsequently identified as one taken of the bicycle appellant was seen riding on June 21, taken into evidence after appellant's arrest.

[4]     In the 911 audio tape -- introduced into evidence by the prosecution -- Melgarejo described the person she saw, the noises she heard, and the bicycle in accordance with her testimony at trial.

Appellant also asked whether Speck still had "that stereo system," and told her to "[b]reak it down to the factory . . . . The way I got it . . . [t]he way that I brought it to your house." After the conversation about the stereo, Speck stated "The X-Box was trippin' . . . so we just took it back and got a Wii."

b. *June 21, 2013 Uncharged Offense*

On the morning of June 21, 2013, Juan Lopez was lying in bed in his home located on East Bort Street near its intersection with Muriel Avenue, less than half a mile from the Ramirez residence. His three daughters were also home. At approximately 8:30 a.m., Lopez heard a loud knocking on the front door. He looked out and saw an African-American man he later identified as appellant walking away from the front door. The man was pushing a light blue bicycle and wearing a black shirt and multi-colored shoes. Moments later, Lopez heard his dogs barking and went to look into his back yard. Someone was trying to open the locked gate to the back yard. Lopez could not see the person's face, but under the gate, he saw the same multi-colored shoes he had just seen on appellant. Lopez went inside to arm himself. When he returned, he saw appellant jump over the fence into his back yard. He went back inside and instructed one of his daughters to call 911.

When police officers arrived, at approximately 8:45 a.m., there was no one in the yard. Approximately five to ten minutes later, Officer Jorge Grajeda spotted appellant about a block from the Lopez residence, wearing a black shirt and riding a blue bicycle with the word "Giant" written on the frame.[5] He questioned appellant and let him go. As appellant was leaving, Lopez approached the officers

---

[5]     Appellant told the officer he was riding "home" from his girlfriend's house. At trial, appellant's parole officer and girlfriend Taquasha Speck both testified appellant lived with Speck and had done so since June 1.

and identified appellant as the man he had seen jump into his back yard.  Appellant was subsequently arrested, and his bicycle booked into evidence and photographed.[6]

### c.  *GPS Evidence*

At the time of the June 4 and June 21 incidents, appellant was on parole and wearing a GPS monitoring device.  Appellant's parole officer Michael Cerezo described placing a monitor on appellant in May 2012 and replacing it in December 2012 with the one he was wearing at the time of his arrest.  The GPS monitor transmits its location and other information, such as whether anyone had attempted to tamper with it and whether it was functioning properly.  Cerezo reviewed the records for appellant's monitor.  He saw no evidence that the monitor had been removed or tampered with, or that it had malfunctioned.  In June 2013, Cerezo visited the home on Cummings Lane where appellant lived with Speck.  He saw a blue bicycle in front of the residence and observed appellant playing video games.[7]

Steven Reinhart, the regional GPS coordinator and the prosecution's expert on GPS devices, testified that each monitor contains a receiver and a cellular modem allowing it to connect to GPS satellites.  The satellites continuously send out radio signals, allowing the monitors to calculate their position on earth within

---

[6]     This was the photograph shown to Melgarejo at trial.

[7]     Shown the same photograph of a bicycle identified by Melgarejo as the one she had seen the day of the June 4 burglary, Cerezo testified that the bicycle he saw at appellant's residence was a darker blue and was a male-style bicycle, not the female-style depicted.

50 feet every minute of every day.[8] The monitors transmit the location data to servers, through cellular towers. They also send information indicating whether they are being charged or tampered with. Reinhart saw no indication that appellant's monitor was malfunctioning or had been tampered with on June 4 or June 21, 2013.

Reinhart generated a tracking report for appellant's monitor for the morning of June 4, 2013. Between 8:00 and 8:29, it showed the monitor being charged at a location on Cummings Lane, where Speck and appellant lived. The monitor remained at that location until 8:36, when it began to show movement. At 8:37, appellant was on a street that intersected Cummings Lane and Marker, travelling at a rate of 7 miles per hour. Thereafter, the report generated by the monitor showed appellant at the following locations at the following times: between 8:38 and 8:40, in the vicinity of the Ramirez residence on Marker, in the front of the house and in the yard of the house next door;[9] at 8:42, in the back of the Ramirez residence; from 8:43 until 8:51, inside the Ramirez residence;[10] at 8:52, back home on Cummings Lane; at 8:59, returning to the Ramirez residence on Marker; at 9:00, inside the residence; at 9:04, back on Cummings Lane.

Reinhart also generated a tracking report for appellant's monitor for the morning of June 21, 2013. It showed appellant on Long Beach Boulevard at 8:37 a.m. and at Muriel and Bort, near the Lopez residence, at 8:38 a.m. Within the next ten minutes, he was shown moving down Muriel to a point south of Bort,

---

[8]     Reinhart explained that sometimes, solid objects, such as buildings and cars, interfere with the satellites' signal, in which case the monitors attempt to determine a general location using nearby cellular towers.

[9]     Speck's home was two blocks from the Ramirez residence.

[10]     At 8:47 and 8:48, the monitor was unable to pick up a satellite signal, and transmitted the location of a nearby cellular tower.

returning to the Lopez residence, at various points on the Lopez property, and travelling along East Scott Street, four blocks south of Bort.

### 2. *Defense Evidence*

The defense called Speck, who testified appellant moved in with her on June 1, 2013. Appellant had an Xbox and stereo system when they began living together. Appellant babysat her son when Speck went to school, Monday through Friday from 8:00 a.m. to 12 noon. She had never found her son unsupervised when she came home. She left her son with appellant on June 4, 2013. When she returned, appellant was there. There were no new possessions in the home.

## D. *Deliberations*

The jury began deliberating on the afternoon of December 18, 2013 and returned a verdict the following afternoon. In the course of its deliberations, the jury sent out notes requesting a "timestamp" for the 911 call, the time at which the police arrived at the Ramirez home, and a readback of testimony regarding the error range of the GPS unit and the replacement of appellant's GPS unit. On the second day of deliberations, the jury declared itself deadlocked. The court told the jurors to continue deliberating, and the jury reached a verdict later that day.

## E. *Verdict and Sentencing*

The jury found appellant guilty of first degree (residential) burglary. The court found the allegations concerning appellant's prior strikes true. The court struck one of the strikes and sentenced appellant to a term of 22 years, consisting of the high term of six years doubled, plus two additional five-year terms under section 667, subdivision (a)(1). The court also imposed various fines and assessments. This appeal followed.

## DISCUSSION

### A. *Evidence Admitted Under Evidence Code section 1101*

Appellant contends the trial court improperly admitted the evidence of the June 21, 2013 incident to support appellant's guilt of the charged burglary committed on June 4. For the reasons discussed, we disagree.

The rules governing the admissibility of evidence of other acts to prove guilt of the charged offense are familiar and well settled. Evidence of specific instances of past conduct to prove conduct on a specific occasion is generally prohibited. (Evid. Code, § 1101, subd. (a).) But Evidence Code section 1101, subdivision (b) permits the admission of evidence that "a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."[11] "When evidence is offered under Evidence Code section 1101, subdivision (b), the degree of similarity required for cross-admissibility ranges along a continuum, depending on the purpose for which the evidence is received. The least degree of similarity is required to prove intent. A higher degree is required to prove common plan, and the highest degree to prove identity." (*People v. Scott* (2011) 52 Cal.4th 452, 470.)

In cases such as the present one in which the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he

---

[11] Although the June 21 incident did not amount to a burglary and was never charged as a crime, actions that can reasonably be interpreted as the precursors to criminal misconduct may be introduced to prove identity under Evidence Code section 1101, subdivision (b). For example, in *People v. Lynch* (2010) 50 Cal.4th 693, abrogated in part on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, where the defendant was charged with robbing and murdering multiple elderly women in their homes, the Supreme Court found the trial court had not erred in admitting the testimony of an elderly woman who lived in the same area as the victims and, within the two-month period in which the charged crimes occurred, had observed the defendant trespassing beneath her window. (*Id*. at p. 706, 756-757.)

committed a crime, civil wrong, or other act, admissibility depends on proof that the charged offense and uncharged actions "'share distinctive common marks sufficient to raise an inference of identity.'" (*People v. Medina* (1995) 11 Cal.4th 694, 748.) Our Supreme Court has said that for uncharged misconduct to be relevant to prove identity, the pattern and characteristics of the uncharged misconduct and the charged offense "'must be so unusual and distinctive as to be like a signature'" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403, quoting 1 McCormick on Evidence (4th ed. 1992) § 190, pp. 801-803) and "'"virtually eliminate[] the possibility that anyone other than the defendant committed the charged offense."'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1003.) "The strength of the inference in any case depends upon . . . the degree of distinctiveness of individual shared marks, and [] the number of minimally distinctive shared marks." (*People v. Thornton* (1974) 11 Cal.3d 738, 756, italics deleted, disapproved in part on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668 and *People v. Martinez* (1999) 20 Cal.4th 225.) The inference "need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together." (*People v. Scott, supra,* 52 Cal.4th at p. 473; see *People v. Reza* (1984) 152 Cal.App.3d 647, 655, quoting *People v. Haston* (1968) 69 Cal.2d 233, 246 ["Modus operandi evidence may be admitted to show identity if, 'the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the . . . offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator [of both offenses is the same] . . . .'"].)

Here, multiple features of the uncharged misconduct and the charged offense matched and supported an inference that the perpetrators of both were the same person. The house burgled on June 4 and the property on which appellant

10

trespassed on June 21 were in the same neighborhood, within half a mile of each other and close to Speck's residence where appellant lived. Both June 4 and June 21, 2013 were weekdays. Both the June 4 perpetrator and appellant arrived at the targeted residences at approximately 8:30 a.m. The June 4 perpetrator "pounded" on the front door; appellant was described as "knock[ing] loudly" on the Lopezes' door. Melgarejo described the person at her door on June 4 as a dark-skinned Hispanic male or a light-skinned African-American male, a description that fit appellant. On June 4, the perpetrator parked a blue Giant bicycle near the front of the house; Lopez saw appellant walking a blue bicycle on June 21 and shortly after arriving on the scene, Officer Grajedo stopped appellant a block from the Lopez residence riding a blue Giant bicycle. After satisfying himself that no one was at home, the June 4 perpetrator went into the back yard to gain entrance to the Ramirez residence; immediately after knocking at the Lopezes' front door, appellant was seen by Lopez attempting to gain access to the back yard through the locked gate and then jumping over the fence. As appellant suggests, knocking on the front door of the targeted house and entering through the back may be commonplace tactics of daylight residential burglars. Here, however, there were a sufficient number of "features of substantial but lesser distinctiveness" -- the precise time of day the incidents occurred, the short span of time between the occurrence of the two incidents, the geographical proximity of the residences, the general description of the June 4 perpetrator matching appellant -- that when combined with the more unusual feature -- the use of a blue Giant bicycle by the perpetrator -- supported the trial court's decision to admit the evidence.

Moreover, another factor that may properly be considered in determining whether the uncharged conduct and the charged offense share distinctive characteristics is "proximity to [the defendant]." (*People v. Erving* (1998) 63 Cal.App.4th 652, 660.) In *Erving*, the defendant had been charged with several

11

counts of arson. To establish identity, the prosecution presented evidence of dozens of fires set in the neighborhoods where the defendant lived, "either at her home or within easy walking distance of it." (*Id*. at pp. 658-661.) The court held that the defendant's "proximity to nearly 40 arson fires in these circumstances provides the 'signature' required for the uncharged fire to be relevant to prove her identity as the arsonist" and that "[t]his mark, standing alone, [wa]s sufficient to support the trial court's order of admissibility." (*Id*. at p. 661.) Here, the charged and uncharged incidents occurred 18 days apart, within a month after appellant moved into the neighborhood. The locations were within a short distance of the home he shared with Speck. Appellant's GPS monitor placed him at both locations when the incidents occurred. The fact that both incidents occurred when appellant was in the proximity was an additional factor supporting the decision to admit the evidence.

Where, as here, the evidence of prior conduct is sufficiently similar to the charged offense to be admissible under Evidence Code section 1101, subdivision (b), "the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.Code, § 352.)'" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328, quoting *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404.) "'Rulings made under [Evidence Code sections 1101 and 352] are reviewed for . . . abuse of discretion. [Citation.]'" (*People v. Foster*, *supra*, at p. 1328.) "'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]'" (*Id*. at pp. 1328-1329.)

12

The trial court did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. "'Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of undue prejudice.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 438-440.) Unduly prejudicial evidence consists of """"evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues"""" (*id.* at p. 439) or that causes the jury to """""prejudg[e]"a person or cause on the basis of extraneous factors"'" [citation].'" (*People v. Foster, supra,* 50 Cal.4th at p. 1331.) Here, the evidence was neither inflammatory nor provocative, but was relevant to the issue of the appellant's identity as the perpetrator of the June 4 burglary. The claim that the jury was unduly prejudiced is contravened by the record of deliberations. The jurors asked several questions pertaining to the timing of the burglary and carefully reviewed the evidence concerning the accuracy of the GPS device before reaching its verdict. Nothing supports the inference that the evidence of the June 21 incident inflamed the jury or led it to resolve appellant's guilt based on bias and emotion. The trial court did not abuse its discretion in admitting the evidence.

B. *Abstract of Judgment*

Both parties agree that the abstract of judgment incorrectly states that the crime of which appellant was convicted was first degree burglary when a resident was "[present]." As discussed, that allegation was stricken by the court. Accordingly, the abstract of judgment must be corrected.

13

**DISPOSITION**

The judgment is affirmed. The clerk of the superior court is directed upon issuance of the remittitur to prepare a corrected abstract of judgment striking the language indicating a person was present during the commission of the burglary. The clerk is directed to forward the corrected abstract to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

COLLINS, J.

14