Opinion
 

 YEGAN, J.
 

 Rhonda Denise Erving was convicted by jury, of four counts of arson (Pen. Code, § 451, subd. (d)) and three counts of attempt to bum (Pen. Code, § 455). She was sentenced to state prison for a total term of six years.
 

 The trial court admitted evidence that, during her childhood in the 1960’s, and during the years 1990 to 1995, 40 additional fires occurred in neighborhoods where appellant lived. It reasoned the uncharged fires were admissible under Evidence Code section 1101, subdivision (b) to prove, among other disputed facts, the identity and intent of the arsonist.
 
 [1]
 
 Appellant contends these fires were not sufficiently similar to each other or to the charged fires to demonstrate either fact. She further argues the uncharged fires should have been excluded because there is no evidence she set them, and because their prejudicial effect substantially outweighs their probative value. We affirm.
 

 The Charged Fires
 

 On August 4, 1995, appellant lived in a triplex at 5th Street and South H Street in Central Oxnard. Between 4 and 4:15 that morning, Rafael and Concepcion Davalos, who live nearby on South H Street, were awakened by their dogs’ barking. Mr. Davalos went outside and saw a dark-skinned woman dressed in dark clothing standing by his house. Two or three minutes later, he returned with his wife. They watched as the woman carried two trash bags full of dried leaves and sticks to their neighbor’s garage door, lit a piece of cardboard with a cigarette lighter, and used the burning cardboard to set the trash bags on fire. Mr. Davalos put the fire out, while Mrs. Davalos chased after the woman. The woman ran through a gate which locked from the opposite side. The Davaloses called police.
 

 
 *657
 
 When Oxnard Police Officer Loredo arrived later that morning, Mrs. Davalos showed him the gate. In an attempt to determine where it led, Loredo followed a nearby path to appellant’s front door. Appellant answered her door and seemed surprised when told about the fire. Although nervous, appellant cooperated by telling Loredo that she worked nights and had not returned until about 4 a.m. She showed Loredo to the gate and told him that she kept it locked, but her son sometimes did not.
 

 The Davaloses were unable to identify appellant in photographic lineups. However, Mr. Davalos identified her at the preliminary hearing. At trial both Mr. and Mrs. Davalos identified her as the woman who set the fire.
 

 Appellant was also charged with setting fire to the back door of her previous residence at 132 Moorpark Avenue in the Silver Strand beach neighborhood. On January 14, 1993, a mop and some rags or towels were propped up against a screen door and lit on fire. This fire was reported in an anonymous telephone call made to a little-used, unpublished private line at the Ventura County Fire Department.
 
 [2]
 
 This telephone call was recorded by fire officials. The caller erroneously stated the fire was located' at 136 Moorpark Avenue. Appellant’s stepfather identified the caller’s voice as appellant’s.
 

 The remaining fires charged against appellant also occurred in the Silver Strand beach neighborhood during the early morning hours of March 15, 1993. Two were set in cars parked on Santa Monica Avenue, a third in a boat parked on the same street, and two others in trash cans on Ventura and Hollywood Avenues. The first car fire was reported at about 1 a.m. At 1:11 a.m., the first trash can fire was discovered. An arson investigator testified this fire had been set about eight to ten minutes earlier.
 

 At 1:08 a.m., a sheriff’s deputy saw appellant walk northbound on Island View Avenue and turn at Moorpark Avenue. Island View intersects Moor-park Avenue and the streets on which the fires occurred. When contacted by the deputy, appellant was carrying a cigarette lighter but was not smoking or carrying cigarettes. She was wearing dark clothing, a black beanie and dark socks with no shoes. Appellant told the deputy that she went outside to investigate after hearing a noise and decided to conduct her “nightly patrol.” Appellant said she spent about 10 minutes walking from Moorpark Avenue to Glendale Avenue and back. The deputy saw no one else walking in Silver Strand around the time of the fires.
 

 
 *658
 
 At trial appellant stated that she had just returned home from work and was outside getting her mail when she was confronted by the deputy. She had been smoking but threw the cigarette away when the deputy drove up. Appellant denied saying that she had gone on a “nightly patrol.”
 

 The Uncharged Fires Childhood Fires
 

 Appellant and her 12 siblings grew up in Oxnard. Her stepfather testified that, during the 1960’s, several fires occurred in houses rented by the family. One was set in a backyard, at least four were set in the parents’ bedroom or closet, and one was set in a kitchen. The stepfather’s truck was also burned.
 

 Appellant’s stepfather suspected all of his daughters of setting the fires. He eventually concluded that his daughter Audra was responsible, and she was committed to a psychiatric facility for one and one-half years. At least one fire occurred during this time. The stepfather’s suspicions then settled on appellant because he thought she was the only child at home who could have set them.
 

 Artesia Fires
 

 Between 1990 and May 1992, appellant lived on Bingham Street in Artesia. During that period, eight fires occurred on Bingham Street and one in her parents’ house, about one mile away. Each was set with an open flame device between midnight and 6 a.m. Four fires were set in trash cans. One occurred in a storage shed in appellant’s backyard. Two were set in vehicles parked near her house, and one occurred across the street when a mop and broom were placed under a back door and set on fire. The fire at appellant’s parents’ home occurred when papers in a desk or chest stored in the garage were set on fire.
 

 Silver Strand Fires
 

 Appellant moved to Silver Strand in May 1992. In August, she hosted a party which disturbed Sami Benson, who lived next door at 136 Moorpark Avenue. She called the sheriff’s department to complain. The party ended shortly after deputies visited appellant’s home in response to the complaint. The next morning, Benson found a pile of burnt trash from a neighbor’s trash can smoldering near her front door.
 

 Twenty-seven more fires occurred in Silver Strand over the next ten months. With the exception of a fire at the offices of Wertenberger Realty
 
 *659
 
 and one in a garage on Glendale Avenue, all of the fires were lit with an open flame device and without accelerants. Trash, wood and other materials on hand were used for fuel. Most were set in locations that were easily accessible to a passerby. Those set in less accessible areas occurred at the back of appellant’s home and in a yard that she shared with her neighbors. All the fires were set during early morning hours, between midnight and 6 a.m. No fires were set on nights when the neighborhood watch group was conducting surveillance from a mobile home parked across the street from appellant’s house.
 

 Oxnard Fires
 

 On August 12, 1993, appellant and her son moved from Silver Strand into the triplex in central Oxnard. Between December 1993 and March 1994, four arson fires were set at a house a few doors down from appellant’s, causing only minor damage. In June 1994, a car belonging to appellant’s neighbor was destroyed by fire about 3 a.m. The car was parked in the neighbor’s driveway and appellant woke him up to tell him about it. At approximately 3:30 a.m. on February 18, 1995, an outdoor storage shed near appellant’s home caught fire.
 

 Section 1101, Subdivision (b)
 

 Appellant contends evidence of the uncharged fires was not relevant to prove identity or intent because they were not sufficiently similar to the charged fires. She further contends the evidence violated her due process rights and section 1101, subdivision (b) because there was no proof she started the uncharged fires.
 
 [3]
 
 We disagree. The charged and uncharged fires were sufficiently similar to be admissible to show her identity as the arsonist, a common plan to commit arson, and her intent in setting fires. (§ 1101, subd. (b);
 
 People
 
 v.
 
 Ewoldt
 
 (1994) 7 Cal.4th 380, 402-403 [27 Cal.Rptr.2d 646, 867 P.2d 757].)
 

 Section 1101, subdivision (b) allows evidence of uncharged misconduct when it is relevant to establish a material fact other than the person’s bad character or criminal disposition.
 
 (People
 
 v.
 
 Ewoldt, supra, 7
 
 Cal.4th at p. 393.) The admissibility of such evidence turns largely on the question whether the uncharged acts are sufficiently similar to the charged offenses to
 
 *660
 
 support a reasonable inference of the material fact they are offered to prove.
 
 (Ibid.; People
 
 v.
 
 Carpenter
 
 (1997) 15 Cal.4th 312, 378-379 [63 Cal.Rptr.2d 1, 935 P.2d 708].) “The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact.”
 
 (People
 
 v.
 
 Thompson
 
 (1980) 27 Cal.3d 303, 317 [165 Cal.Rptr. 289, 611 P.2d 883].)
 

 Here, the prosecution offered evidence of the uncharged fires to prove appellant’s identity, knowledge, intent, common plan, and motive. “The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.”
 
 (People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th at p. 403.) Thus, if the uncharged misconduct is similar enough to prove identity, it is similar enough for other disputed issues, i.e., common plan, knowledge, intent, and motive.
 

 “For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] ‘The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.’ (1 McCormick [on Evidence (4th ed. 1992)], § 190, pp. 801-803.)” (7 Cal.4th at p. 403.)
 

 Although characteristics common to both the charged and uncharged acts must be distinctive, they may be few in number. For example, in
 
 People
 
 v.
 
 Robinson
 
 (1995) 31 Cal.App.4th 494 [37 Cal.Rptr.2d 183], the defendant claimed error in his arson trial because the court admitted evidence that, three days before the charged arson, he and a person named Ny Brown were seen setting fire to a car parked outside the residence that burned in the charged offense. The court held that evidence of the car arson satisfied
 
 Ewoldt's,
 
 “stringent ‘identity’ standards . . . ,”because“. . . the two arsons shared ‘a mark whose distinctive nature tends to differentiate those offenses from other’ arsons.” That “mark” was the presence at both fires of the defendant and Ny Brown. This common fact was enough to “ ‘support[] the inference that defendant and not some other person was [Brown’s] accomplice in [the] charged offense[].’”
 
 (People
 
 v.
 
 Robinson, supra,
 
 31 Cal.App.4th at p. 503, quoting
 
 People
 
 v.
 
 Haston
 
 (1968) 69 Cal.2d 233, 249 [70 Cal.Rptr. 419, 444 P.2d 91].)
 

 To be sure, appellant did not throw pink gloves to the ground after committing the crimes like the thief in the Pink Panther (Mirisch Co. 1963), or leave the tap water running to flood a residence, like the burglars in Home Alone (20th Century Fox 1990). Here, the calling card or signature of the fires was more subtle: proximity to appellant. Each fire was
 
 *661
 
 set in the immediate neighborhood where appellant lived, either at her home or within easy walking distance of it. Few, if any, arson fires occurred in those immediate neighborhoods before appellant lived in them and they stopped when she moved. Appellant’s proximity to nearly 40 arson fires in these circumstances provides the “signature” required for the uncharged fires to be relevant to prove her identity as the arsonist. This mark, standing alone, is sufficient to support the trial court’s order of admissibility.
 
 [4]
 

 Although unnecessary to our holding, we also observe that the fires were similar to one another in other respects. All were started using an open flame device, without accelerants, during the early morning hours. They were set in areas that are accessible from the street or to which appellant had access. Each fire used for fuel materials that were already present at the scene, such as trash, the upholstery in a car, the sheets on a bed, or the objects inside a closet. Each fire involved one of a limited category of objects: trash cans, vehicles, storage sheds, doors, or bedrooms.
 

 The Doctrine of Chances
 

 Appellant argues the trial court improperly relied on the “doctrine of chances” to justify admission of this evidence and that the prosecutor improperly argued the import of the doctrine to the jury. The doctrine of chances relies on “ ‘the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. . . . [A]n unusual and abnormal element might perhaps be present in one instance, but . . . the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them. [¶] . . . In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act ....’ ”
 
 (People
 
 v.
 
 Robbins, supra,
 
 45 Cal.3d 867, 879-880, quoting 2 Wigmore, Evidence (Chadboum ed. 1979) § 302, p. 241.)
 

 
 *662
 
 This doctrine has been used to justify the admission of evidence of uncharged acts to prove the actor’s intent. For example, in
 
 People
 
 v.
 
 Robbins,
 
 evidence that the defendant kidnapped, sodomized, and strangled a seven-year old boy in Texas six months before he did the same things to a six-year old boy in California was held admissible to rebut his claim that he did not intentionally or deliberately kill the second boy.
 
 (People
 
 v.
 
 Robbins, supra,
 
 45 Cal.3d at p. 873.) Similarly, in
 
 People
 
 v.
 
 Carpenter, supra,
 
 15 Cal.4th 312, evidence that the defendant shot three persons in 1980 was admitted in his trial for two murders and an attempted murder in 1981. Applying the “doctrine of chances,” our Supreme Court concluded: “A jury could reasonably infer from the evidence that defendant shot and killed three persons in 1980, that he intended to kill when he shot and killed two others, and shot but only wounded a third several months later.”
 
 (Id.
 
 at p. 380.)
 

 Appellant contends the doctrine of chances does not apply here because the uncharged fires were admitted to show identity, not intent. But the evidence was admitted for both purposes and appellant placed her intent in issue when she pleaded not guilty.
 
 (People
 
 v.
 
 Balcom
 
 (1994) 7 Cal.4th 414, 422-423 [27 Cal.Rptr.2d 666, 867 P.2d 777].)
 

 Moreover, the doctrine of chances also applies to evidence of identity. In
 
 U.S.
 
 v.
 
 York
 
 (7th Cir. 1991) 933 F.2d 1343, the defendant was convicted of attempting to defraud an insurance company after he murdered his business partner, dumped her body inside the bar they owned together, and then destroyed the bar by setting off two explosions. The court held admissible evidence that, three years earlier, the defendant collected life insurance proceeds after his wife was murdered, even though the defendant was never charged with her murder. “Wigmore’s ‘doctrine of chances’ tells us that highly unusual events are highly unlikely to repeat themselves .... [T]he odds of the same individual reaping [life insurance] benefits, within the space of three years, of two grisly murders of people he had reason to be hostile toward seem incredibly low, certainly low enough to support an inference that the windfalls were the product of design rather than the vagaries of chance. . . . This inference is purely objective, and has nothing to do with a subjective assessment of York’s character.”
 
 (U.S.
 
 v.
 
 York, supra,
 
 933 F.2d at p. 1350.)
 

 Similarly, in
 
 United States
 
 v.
 
 Woods
 
 (4th Cir. 1973) 484 F.2d 127, the defendant murdered her eight-month-old preadoptive foster son, Paul, by inducing cyanosis and other respiratory difficulties. The court held admissible evidence that nine infants in her custody had suffered similar difficulties, and that seven of the infants died. Applying the doctrine of chances, the court held the other deaths were admissible to prove the identity of Paul’s
 
 *663
 
 murderer, “because of the remoteness of the possibility that so many infants in the care and custody of defendant would suffer . . . respiratory difficulties if they were not induced by the defendant’s wrongdoing ...”
 
 (Id.
 
 at p. 135.)
 

 The same reasoning applies here. Appellant lived in four different, geo- - graphically distant neighborhoods. Arson fires regularly occurred either at her home, or within easy walking distance of it. The fires were set during her residency and stopped when she moved. In one neighborhood, appellant was seen attempting to set a fire. In another, she was the only person seen on the street while five arson fires burned a few blocks away. The doctrine of chances tells us it is extremely unlikely that, through bad luck or coincidence, an innocent person would live near so many arson fires, occurring so frequently, in so many different neighborhoods. The trial court, in ruling on the section 1101, subdivision (b) issue, and the jury could logically infer from the uncharged fires that appellant was the arsonist. “This inference is purely objective, and has nothing to do with a subjective assessment of [appellant’s] character.”
 
 (U.S.
 
 v.
 
 York, supra,
 
 933 F.2d at p. 1350.)
 

 Profile Theory
 

 Nor can we agree that evidence of the uncharged fires was used to show that appellant fit the “profile” of a serial arsonist. Many cases have held inadmissible evidence that a defendant shares character traits with, or fits the same profile as persons who have been convicted of similar crimes. (See, e.g.,
 
 People
 
 v.
 
 Castaneda
 
 (1997) 55 Cal.App.4th 1067, 1072 [64 Cal.Rptr.2d 395] [testimony that defendant “perfectly fit” one police officer’s “profile of the typical heroin dealer in Northern San Diego County[,]” inadmissible in trial for possession of heroin];
 
 People
 
 v.
 
 Hernandez
 
 (1997) 55 Cal.App.4th 225 [63 Cal.Rptr.2d 769] [evidence from police sex crimes data base inadmissible at trial for two sexual assaults included in the data base];
 
 People
 
 v.
 
 Martinez
 
 (1992) 10 Cal.App.4th 1001 [12 Cal.Rptr.2d 838], [expert testimony on auto theft and smuggling rings inadmissible to prove defendant knew the car he bought was stolen];
 
 People
 
 v.
 
 Long
 
 (1970) 7 Cal.App.3d 586, 590 [86 Cal.Rptr. 590] [evidence of three checks forged by another person that were similar to those passed by defendant inadmissible in his forgery trial].)
 

 Profile evidence is inadmissible because “every defendant has the right to be tried based on evidence tying him to the specific crime charged, and not on general facts accumulated by law enforcement regarding a particular criminal profile.”
 
 (People
 
 v.
 
 Castaneda, supra,
 
 55 Cal.App.4th at p. 1072.) Moreover, such evidence encourages the jury to engage in circular reasoning. (See
 
 People
 
 v.
 
 Martinez, supra,
 
 10 Cal.App.4th at pp. 1007-1008.) As
 
 *664
 
 the court reasoned in
 
 People
 
 v.
 
 Long,
 
 circumstantial evidence of uncharged acts not tied to the defendant may not be used in such a way that “ ‘proof of the crime charged is used to bolster up the theory . . . that the defendant must have committed the prior act, and the conclusion that he must have committed the prior act is then used in turn to strengthen the theory and induce the conclusion that he must also have committed the crime charged. This is but a vicious circle.’ ”
 
 (People v. Long, supra,
 
 7 Cal.App.3d at p. 590, quoting
 
 People v. Albertson
 
 (1944) 23 Cal.2d 550, 580-581 [145 P.2d 7].)
 

 The vicious circle described in
 
 Long
 
 is not present here. Each of the profile cases cited by appellant lacked evidence tying the defendant to the persons on whom the profile was based. For example, in
 
 People v. Castaneda, supra,
 
 55 Cal.App.4th 1067, the expert witness described common characteristics of heroin dealers, but had no evidence that the defendant knew the dealers or was involved with them. Here, .by contrast, there was substantial evidence linking appellant to both the charged and the uncharged fires. Accordingly, evidence of the uncharged fires did not amount to evidence that appellant fit a criminal “profile.”
 

 Probative Value Versus Undue Prejudice
 

 “Evidence of uncharged offenses ‘is so prejudicial that its admission requires extremely careful analysis. [Citation.]’ ”
 
 (People v. Ewoldt, supra,
 
 7 Cal.4th at p. 404, quoting
 
 People v. Smallwood
 
 (1986) 42 Cal.3d 415, 428 [228 Cal.Rptr. 913, 722 P.2d 197].) Appellant contends the trial court failed to conduct that analysis here because it did not state its reasons for concluding that the probative value of this evidence substantially outweighed its potential for undue prejudice or juror confusion, and because its jury instructions did not identify the material fact each uncharged fire was admitted to prove.
 
 (People v. Ewoldt, supra,
 
 7 Cal.4th at p. 404.)
 

 The trial court, however, “need not expressly weigh prejudice against probative value—or even expressly state that [it] has done so.”
 
 (People v. Mickey
 
 (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84].) Instead, the record need only demonstrate that the trial court “understood and fulfilled its responsibilities under Evidence Code section 352. Nothing more was required.”
 
 (People v. Garceau
 
 (1993) 6 Cal.4th 140, 182 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Nor was the trial court required to identify for the jury the specific material fact each uncharged fire was admitted to prove. “Such an instruction would have [been] argumentative and repetitious of instructions already given.”
 
 (People v. Linkenauger
 
 (1995) 32 Cal.App.4th 1603, 1615 [38 Cal.Rptr.2d 868].)
 

 Appellant argues evidence of the uncharged fires had only marginal probative value because the prosecution never demonstrated that she set
 
 *665
 
 those fires. She concludes the trial court abused its discretion because the marginal probative value of the uncharged fires was outweighed by their potential for undue prejudice. We cannot say, as a matter of law, that the trial court abused its discretion in admitting the uncharged fires.
 
 (In re Cortez
 
 (1971) 6 Cal.3d 78, 85-86 [98 Cal.Rptr. 307, 490 P.2d 819].)
 

 The judgment is affirmed.
 

 Gilbert, Acting P. J., and Coffee, J., concurred.
 

 A petition for a rehearing was denied May 15, 1998, and appellant’s petition for review by the Supreme Court was denied August 12, 1998.
 

 [1]
 

 All further statutory references are to the Evidence Code.
 

 [2]
 

 The telephone call was made about 4:30 a.m. At 4:34 a.m., a sheriff’s deputy arrived to look for the fire. He searched the area around 136 and 140 Moorpark but could not locate a fire. About three minutes later, the deputy smelled smoke. He checked behind the houses, found the fire at appellant’s back door, and extinguished it with a hose. Appellant was at home and awake when the deputy found the fire.
 

 [3]
 

 Section 1101, subdivision (b) provides: “Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.”
 

 [4]
 

 Our holding should not be interpreted as applying to a situation where the defendant has proximity to a small number of fires and there is no ebb and flow of fires. The logical inference that a defendant sets fires becomes more compelling as the number of fires in proximity to the defendant increases, and even more compelling when the fires only occur at a time when the defendant has proximity to them. (Cf.
 
 People
 
 v.
 
 Robbins
 
 (1988) 45 Cal.3d 867, 880-881, fn. 5 [248 Cal.Rptr. 172, 755 P.2d 355].) In this latter situation, the inference of identity logically operates to set the charged and uncharged offenses apart from crimes of the same general variety. (See
 
 People
 
 v.
 
 Rivera
 
 (1985) 41 Cal.3d 388, 392 [221 Cal.Rptr. 562, 710 P.2d 362].)