Filed 2/23/16  P. v. Valerio CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOHN J. VALERIO,<br><br>　　　　Defendant and Appellant. | B260150<br><br>(Los Angeles County<br>Super. Ct. No. PA 069284) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Daniel B. Feldstern, Judge.  Affirmed.

Kristin A. Erickson, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, Eric E. Reynolds, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant John Valerio (defendant) on arson, insurance fraud, and conspiracy charges. The prosecution introduced evidence to show, among other things, that defendant was experiencing financial difficulties, that he took out a $4 million dollar insurance policy on his business, that six weeks after the policy took effect someone entered the business using his alarm code and intentionally caused an explosion and fire, and that defendant thereafter submitted an insurance claim for the full value of the policy. The trial court also permitted the prosecution to introduce evidence of an incident four years earlier when someone intentionally set fire to defendant's car. We are asked to decide whether the trial court prejudicially erred in permitting the prosecution to introduce evidence of the prior car fire under Evidence Code section 1101, subdivision (b).

## I. BACKGROUND

Defendant was the Chief Financial Officer and co-owner of Globotech, an electronic parts distribution company. Globotech's offices were located in a two-story concrete slab building in Santa Clarita, California. On October 24, 2009, at approximately 9:30 p.m., an explosion and fire burned Globotech's offices. The Los Angeles County District Attorney later charged defendant in an amended information with arson of a structure (Penal Code[1] § 451, subd. (c)) in count 1, insurance fraud (§ 550, subd. (a)(1)) in count 2, and conspiracy to commit arson and insurance fraud (§ 182, subd. (a)(1)) in count 5.[2]

---

[1]     Undesignated statutory references that follow are to the Penal Code.

[2]     During trial, the court granted the prosecution's motion to dismiss the other counts of the information, counts 3, 4, and 6.

A. *Evidence at Trial Concerning the Charged Arson and Insurance Fraud*
   *Offenses*

Defendant and his business partner Sergio Ramirez (Ramirez) opened Globotech in 2007. By 2009, Globotech—which was funded by investors, many of whom were defendant's family members and friends—faced financial difficulties. The company sold two different categories of parts, electronic components and telecommunications equipment. In 2009, the electronic components part of the business was foundering because the parts were not selling.[3] The telecommunications equipment side of the business, however, was doing better. These circumstances caused a falling out between defendant and Ramirez in July or August of 2009. Ramirez wanted to dissolve the company and focus solely on selling telecommunications equipment. Defendant, however, felt pressure to return the amount his family and friends had invested in Globotech, and Ramirez's plan to dissolve the company would prevent them from recouping their investments, which totaled about $1 million in the aggregate. Ramirez decided to leave Globotech to start his own telecommunications company, leaving defendant to run Globotech with one other employee in Santa Clarita, Ron Reyes (Reyes).

Defendant also faced personal financial difficulties in 2009. Scott Lollis (Lollis), a Globotech employee who was also a long-time acquaintance of defendant's, observed defendant was "pretty stressed" in the beginning of 2009 and asked defendant what was wrong. Defendant told Lollis that the Internal Revenue Service was suing him for $500,000. Defendant was also going through a contested divorce in 2009 and was having "some issues" because his wife was demanding defendant pay her a greater amount of money per month than he was then paying.

---

[3] The defense admitted documents at trial intended to show that, shortly before the fire at Globotech, defendant did have one or more pending deals to sell electronic components. During closing argument, the prosecution argued the components referred to in the documents were not among the components inside the Globotech building when the fire occurred.

From the time Globotech opened until Ramirez left in mid-2009, the company had been uninsured. After Ramirez left the company, defendant contacted a Farmer's Insurance representative to procure insurance for Globotech's property, including its parts inventory. The representative visited the Globotech premises on three or four occasions in August 2009 to discuss insurance terms and inspect the location.[4] Defendant told the representative that he did not need insurance to cover any damage to the building itself, which defendant was leasing; defendant wanted insurance only for Globotech's property inside. Defendant said Globotech's inventory was worth almost $2 million, but he wanted to see insurance quotes for policies that would cover losses at four different values, $1 million, $2 million, $3 million, and $4 million, because he was planning on increasing inventory. The Farmer's representative told defendant there was no reason to write him a policy for $4 million if he only had $2 million in inventory because it was easy to increase the policy's covered loss amount once inventory actually increased; in the representative's view, paying premiums on a $4 million policy would be like "paying for a car two months before you bought it." Defendant, however, told the representative he wanted $4 million in coverage, and the representative issued a policy with coverage for that amount to take effect on September 11, 2009.

Around the same time that defendant was insuring the business, late July and August of 2009, defendant also had an alarm system installed at Globotech's offices and had the locks changed on the building's front door. When the alarm system was installed, defendant and his sole employee Reyes were the only ones who were given codes to arm and disarm the system. Each man had a different code, and defendant did not know Reyes's code nor did defendant disclose his own code to Reyes (or, as defendant would later claim after the fire, anyone else). The locks that defendant had installed at

---

[4] The Farmer's Insurance representative observed "a bunch of pictures" on defendant's desk during his first visit, and defendant told him they were pictures of his children and his girlfriend. On one of the subsequent visits, the representative noticed the photos were gone, which he found odd.

4

Globotech's offices were "Laser Tech" locks that are nearly impossible to pick because of their advanced design. Defendant and Reyes were the only people that had keys to the locks.

On Friday, October 23, 2009, the day before the fire at Globotech, defendant was the last to leave the office at the end of the day. He locked the doors and he set the alarm when he left the premises.

The next day, the day of the fire, Reyes was not at Globotech to the best of defendant's knowledge. Defendant took an overnight trip to Disneyland with his kids and girlfriend. At 6:20 p.m. that day, someone entered Globotech's offices and deactivated the alarm system using defendant's alarm code. The alarm was then reactivated at 8:31 p.m. using the same code.

Cell phone records revealed 14 calls were made from a phone registering with a cellular tower in the area of Globotech's offices between 5:42 p.m. and 8:39 p.m. on the evening of the fire. Among the calls was a 6:39 p.m. call to defendant (19 minutes after the Globotech alarm was deactivated) and another call to defendant at 8:39 p.m. (eight minutes after the alarm had been reactivated). Just under an hour after the 8:39 p.m. call to defendant, the explosion and fire occurred at Globotech.

Firefighters responded to Globotech that evening, and the scene when they arrived was atypical because there was debris in the front of the building and an obvious odor of gasoline in the air that indicated there had been some type of explosion. The next day, Los Angeles County Sheriff's Detective Michael Digby, an arson investigator, assembled a team and travelled to Globotech to investigate the explosion and fire.

At the scene of the fire, Detective Digby observed an oily substance on the asphalt near the building and he could smell gasoline. He observed explosion debris near the front door, and a butane lighter was found in explosion debris littering the parking lot. A large roll-up door at the rear of the building had been blown out, and the front door had blown off intact and the lock had not been tampered with. The building's front door was the only door that could be opened from the outside, and there were no observed signs of

forced entry into the building.[5]  The walls of the building were over 20 feet high, and the only access to the roof was via a ladder inside the building.

Inside the building, investigators found a red gasoline can in an office area.  The carpet in the office area had irregular burn patterns, which according to Digby could indicate the presence of an ignitable fluid at the time of the fire.  A carpet sample taken from the business tested positive for the presence of gasoline.

On the roof of the building, Digby found a pool of an oily substance and three road flares that had burned to varying degrees.  Digby testified that he had come across road flares many times in the arsons he previously investigated.  Two of the flares on Globotech's roof were in the pool of liquid and one was not.  Several dozen holes had been drilled into the roof for the purpose of permitting the fluid, later confirmed to be oil, to drain into the building.

Based on his investigation, Digby believed the road flares on the roof were not what ignited the fire.  He believed the road flares had been thrown onto the roof from the walkway in front of the building, and two of the flares had been extinguished by the liquid while the third burned down on its own.  (Digby explained that road flares may not ignite a liquid, particularly a liquid like oil that is not especially flammable, because the liquid chokes off the oxygen necessary to start a fire.)  Instead, Digby opined that the fire originated in the mail slot at the front door when someone used the lighter investigators found in the debris to set the gasoline on fire.  Digby believed, based on the amount of preparation involved, that more than one person was involved in starting the fire at Globotech and that when the perpetrators who attempted to start the fire observed that the flares on the roof had been ineffective, at least one person then went back and started the fire at the mail slot by using the lighter.

---

[5]     At trial, defense counsel called Detective Digby as a witness during the defense case and asked him questions concerning several photographs of a skylight in the roof of the building that the defense believed could have been a point of forced entry.  On cross-examination, however, Digby testified the skylight was damaged by the explosion and showed no signs of forced entry.

In Digby's expert opinion, the fire and explosion were a deliberate act of arson, and he also believed there were indicia the arson was committed for profit. Digby based his arson conclusion on the presence of the disposable lighter, the gasoline can, and the ignitable pour patterns in the office. As to his belief the arson may have been committed for profit, Digby found it significant that there were no personal photographs or personal memorabilia in the office, and that most of the desk drawers in the office were empty. Digby explained that in his prior experience with cases where someone had intentionally burned their own house, vehicle, or other commercial property, the owner had often removed personal items before the fire or replaced such items with things that are less personal. Digby also believed profit may have been the motive for the Globotech arson because defendant obtained an insurance policy just six weeks before the fire; as Digby explained, insurance fraud was the most typical form of arson for profit.

Two days after the explosion and fire at Globotech, defendant called his Farmer's Insurance representative and told him what had happened. The representative told defendant to call the claims department but warned him it was "probably going to look a little fishy." Defendant submitted an insurance claim for $4,713,058.27 in losses as a result of the fire.

Three days after the explosion and fire, Detective Digby interviewed defendant in the parking lot outside the Globotech building. In that interview, Digby asked defendant whether Ramirez could have been responsible for setting the fire. Defendant said probably not, because it wasn't in Ramirez's nature, but defendant did tell Digby it could have been Nigerians in Lagos, Nigeria that had run an internet scam and embarrassed him. Detective Digby also asked defendant about his whereabouts on the day of the fire at Globotech. Defendant related his comings and goings in great detail, including his attendance at a little league baseball game and the overnight visit to Disneyland. Defendant also had receipts documenting his whereabouts on October 24, 2009, which he provided to Digby "right then and there" during the interview. Digby thought this was

unusual because, in his prior experience, business owners generally did not feel a need to account for where they were at the time of a fire in such tremendous detail.

### B.    *The Prior Uncharged Vehicle Arson*

Prior to trial, the prosecution sought the court's permission to introduce, under Evidence Code section 1101, subdivision (b), evidence that someone had deliberately set fire to defendant's car in 2005 using gasoline and road flares, and that defendant submitted an insurance claim for the damages. The prosecution argued evidence concerning the 2005 car fire should be admitted because it involved the same means, gasoline and road flares, involved in the charged Globotech arson. Defendant objected, contending there was no evidence that defendant was responsible for the 2005 car fire: "[T]he evidence will show that the insurance company in that case actually paid [defendant]. So the insurance company for that damage actually believed that [defendant] was not responsible for that, nor was he even charged in that case. So the idea that that incident happened in a prior case is—again, he wasn't charged. It's not established that he did that."

After taking the matter under submission, the trial court ruled the prosecution could present evidence concerning the 2005 car fire at trial. The court noted that it had reviewed the case of *People v. Erving* (1998) 63 Cal.App.4th 652 (*Erving*), which discussed the "doctrine of chances," and stated: "[I] come down to a question of what are the chances that a single individual within a four-year span would have two sources of property both burn in very similar ways involving the source of ignition being road flares on flammable liquid or attempted use of road flares, [these facts are] distinctive and ties [the two incidents] together in the sense of how the person who caused these fires prepared the event for the arson. It may demonstrate evidence that establishes the identity of the person or persons involved in both arsons because they had a similar tie to [defendant]." Beyond being evidence of identity, the trial court also found that the similarities between the charged offenses and the 2005 car fire were relevant to

8

undermine any claim that the Globotech fire was an accident or a mistake and were probative of whether defendant had the intent to defraud an insurance company. The trial court further found that any prejudice from admitting the 2005 car fire evidence did not outweigh the evidence's "significant" probative value.

At trial, evidence concerning the 2005 car fire came from three sources: testimony by Enrique Velazquez, a Deputy Sheriff who investigated the 2005 car fire; testimony by former Globotech employee Lollis; and statements defendant made in an under-oath examination conducted by Farmer's Insurance in connection with his Globotech insurance claim.

Velazquez testified that defendant's car, a Volkswagen defendant converted to look like a Porsche, was parked outside a home in Lancaster on October 3, 2005. Defendant told Deputy Velazquez that he had loaned his car to his sister so she could visit his ex-girlfriend who lived at the Lancaster address. In the early morning hours on October 3, someone poured gasoline in the passenger compartment of defendant's car and then tossed a road flare inside. Deputy Velazquez investigated the car arson and testified that the police had not arrested anyone for the offense. When Velazquez asked defendant who might have been responsible for burning his car, defendant said the only people he might suspect were his ex-girlfriend's former husband and her new boyfriend.

Lollis testified about a conversation he had with defendant about his car being burned. According to Lollis, defendant said someone had poured gasoline in his car and thrown a road flare in it while it was parked at his sister's house. Lollis also testified that defendant said he was not positive who was responsible.

Excerpts of the Farmer's Insurance examination of defendant that were read to the jury included defendant's answers to questions concerning the 2005 car fire. Defendant stated his sister had borrowed the car and someone burned the car in front of a house occupied by a friend of defendant's sister. Defendant told the insurance examiner there were no suspects or people defendant thought may have been responsible. Defendant also

9

stated he filed an insurance claim for the damage and the insurance company paid an amount in the "mid-20s" on the claim.

After the presentation of evidence at trial, the trial court instructed the jury on the circumstances under which it may and may not consider evidence of the 2005 car fire using CALCRIM No. 375, tailored to the facts of the case. The instruction informed the jury that it could consider evidence of the uncharged 2005 car fire "only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged act[]." The instruction told the jury it must disregard the evidence entirely if the People had not met that burden. If the jury decided defendant did commit the uncharged act, the instruction informed the jury it may consider the evidence for the limited purpose of deciding identity, intent, or the existence of a plan or scheme to commit the crimes of arson and insurance fraud—but for no other purpose.

## II. DISCUSSION

Defendant argues the trial court erred in admitting evidence of the 2005 car fire, and that the error resulted in prejudice warranting reversal. The trial court applied *Erving*'s doctrine of chances in ruling the 2005 car fire was admissible. That is, the court concluded the jury could find defendant committed the uncharged 2005 car fire because it was unlikely that defendant would be the victim of two arsons committed in a similar manner if he did not have a role in committing both offenses. Although a decision to apply the doctrine of chances under these circumstances might otherwise warrant a careful analysis, there is no reasonable probability of a more favorable outcome for defendant if the evidence of the 2005 car fire had been excluded. We affirm for that reason.

Evidence that a defendant committed a crime, civil wrong, or other act apart from the charged crime(s) is inadmissible to prove the defendant had a propensity to commit the charged offense (Evid. Code, § 1101, subd. (a).) However, such "other act" evidence may be admitted when relevant to prove some other material fact, including intent,

10

knowledge, identity, motive, or the existence of a common design or plan. (Evid. Code, § 1101, subd. (b); *People v. Leon* (2015) 61 Cal.4th 569, 597 (*Leon*); *People v. Ewoldt* (1994) 7 Cal.4th 380, 400.) "The relevance depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact." (*Leon, supra,* at p. 598.) Even if other crimes evidence is relevant, it should be excluded under Evidence Code section 352 if its probative value is substantially outweighed by undue prejudice. (*People v. Thomas* (2011) 52 Cal.4th 336, 354.) On appeal, we review a trial court's evidentiary ruling for abuse of discretion. (*Leon*, *supra*, at p. 597.)

There were sufficient similarities between the 2005 car fire and the charged offenses, particularly the use of gasoline and road flares, to support a rational inference that the person who committed the 2005 car fire was also responsible for the Globotech arson. Defendant protests, however, that the existence of these similarities should not end the inquiry because there was insufficient evidence he committed the prior act, i.e., that he set fire to his own car and fraudulently submitted an insurance claim for the damage.

A jury may consider other acts evidence if the prosecution proves by a preponderance of the evidence that the defendant committed the other act. (*Leon, supra,* 61 Cal.4th at p. 599; *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1444-1445.) Thus, for other act evidence to be admissible, there must be sufficient evidence to permit the jury to make such a finding.[6]

---

[6]      Our Supreme Court has repeatedly rejected the argument that the admissibility of uncharged other act evidence requires "proof that the defendant was the perpetrator" of the other act or crime. (See, e.g., *Leon, supra,* 61 Cal.4th at p. 599.) That is to say, the Supreme Court has rejected the view that "it must be conceded, or a court must be able to assume that the defendant was the perpetrator" to conclude other act evidence is admissible. (*People v. Soper* (2009) 45 Cal.4th 759, 778; *People v. Foster* (2010) 50 Cal.4th 1301, 1332 [rejecting defense argument that other act evidence was inadmissible because the identity of the perpetrator was in dispute].) Instead, the Supreme Court has held other act evidence is admissible if there is enough evidence to allow a jury to conclude the defendant more likely than not committed the other uncharged offense. (*Leon, supra*, at p. 599.)

11

(*People v. McCurdy* (2014) 59 Cal.4th 1063, 1097; see *People v. Marshall* (1996) 13 Cal.4th 799, 832 [explaining, in reference to Evidence Code section 403, that "the trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence"].)

The trial court, citing *Erving*, *supra*, 63 Cal.App.4th 652, relied on the doctrine of chances to conclude there was sufficient evidence to permit the jury to conclude defendant committed the 2005 car fire, reasoning: "what are the chances that a single individual within a four-year span would have two sources of property both burn in very similar ways involving the source of ignition being road flares on flammable liquid . . . . *It may demonstrate evidence that establishes the identity of the person or persons involved in both arsons* because they had a similar tie to [defendant]." (Emphasis added.) We find it unnecessary to parse *Erving*, and the cases cited therein, to analyze the trial court's application of the doctrine in this case because it plainly appears the trial court's decision to admit the 2005 car fire evidence was harmless on this record.

We assess prejudice using the *People v. Watson* (1956) 46 Cal.2d 818 test, asking whether it is reasonably probable that exclusion of the evidence would have produced a result more favorable to the defendant.[7] (*People v. Malone* (1988) 47 Cal.3d 1, 22 [error in admitting other acts evidence reviewed under *People v. Watson*, not *Chapman v. California* (1967) 386 U.S. 18]; *People v. Lopez* (2011) 198 Cal.App.4th 698, 716.)

No more favorable result is reasonably probable on this record because the circumstantial evidence of defendant's guilt was quite strong apart from the evidence the

---

[7] Although defendant did not object to admission of the other act evidence on federal constitutional grounds in the trial court, on appeal he asserts admission of the evidence violated his Fourteenth Amendment due process right to a fair trial. Defendant's federal constitutional claim is meritless. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.*" (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Lucas* (1995) 12 Cal.4th 415, 464; *People v. Cudjo* (1993) 6 Cal.4th 585, 611.) Admission of the 2005 car fire evidence did not render defendant's trial fundamentally unfair.

jury heard concerning the 2005 car fire. The prosecution proved defendant had a powerful motive to commit the crime because he and his business were suffering financial difficulties and he felt pressure to return the money his mother and other family and friends had invested in Globotech.[8] It was undisputed at trial that defendant insured the business—which had never been insured before—just six weeks before the explosion and fire, and defendant took out a policy over twice as valuable as the goods he was insuring even though the Farmer's Insurance agent explained it was unnecessary to do so. The prosecution also introduced strong circumstantial evidence that defendant must have been involved, with unnamed others, because of the manner in which the offense was committed: the person or persons that actually started the fire entered the building without signs of forced entry and notwithstanding defendant's recent installation of high-security locks; defendant's alarm code was used to deactivate the system; defendant's personal photos and business documents did not burn because they had been removed before the fire; and defendant received calls from someone using a cell phone in the general vicinity of Globotech on the night of the fire, including one call shortly after the alarm was deactivated and a second call shortly after the alarm had been reactivated—and the explosion occurred less than an hour after that second call. With such a strong circumstantial case, we are confident it is not reasonably probable the verdict turned on the other act evidence the trial court admitted.

Our conclusion that there was no prejudicial error is reinforced by the manner in which counsel argued the case and by the other act evidence jury instruction given by the trial court. The prosecutor made only a brief reference to the other act evidence during summation and did not refer to the 2005 car fire at all during rebuttal argument. Likewise, defense counsel did not spend substantial time discussing the 2005 car fire during his closing argument, and instead focused on attempting to undermine the other

---

[8]     There was no evidence at trial that anyone but defendant had a motive to set fire to Globotech. When Detective Digby interviewed defendant after the incident and asked if he could think of anyone who might be responsible, defendant answered only with the dubious assertion that it could have been unnamed individuals in Lagos, Nigeria.

13

circumstantial evidence of guilt presented by the prosecution.  The court's jury instruction also directed the jurors to consider the other act evidence only for a limited purpose—and to refrain from considering the evidence at all if it could not find by a preponderance of the evidence that defendant committed the prior act.  Thus, the jury may have disregarded the other act evidence entirely.  (See *Griffin v. United States* (1991) 502 U.S. 46, 59 [juries are well equipped to analyze evidence and avoid relying on a factually inadequate theory].)  But, as we have said, even if the jury did consider the evidence during its deliberations, we believe there is no reasonable probability that the jury would have reached a different verdict if the evidence had instead been excluded.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We Concur:

TURNER, P.J.

KUMAR, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14