Filed 6/15/21  P. v. Dorsey CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DESHAWN CHRISTOPHER DORSEY et al.,<br><br>    Defendants and Appellants. | D076501<br><br><br>(Super. Ct. Nos. SCD268251; SCD266202; SCD272022; SCD276978) |

APPEALS from a judgment of the Superior Court of San Diego County, Eugenia Eyherabide, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Deshawn Christopher Dorsey.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant Tyree Carter, Jr.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Evidence at a joint trial showed that defendants Deshawn Christopher Dorsey and Tyree Carter, Jr. were gang members who conspired to kill suspected rival gang members. They performed numerous overt acts in furtherance of the ongoing conspiracy. After Dorsey and Carter obtained firearms and ammunition, they went on a shooting spree during a week in March 2016. On March 9, while driving through two different locations within rival gang territory, defendants shot at multiple victims; several victims survived (attempted murders), and one victim died (murder). The next day, at a vigil for defendants' deceased fellow gang member, the same firearm used in the shootings was discharged again, ostensibly by Dorsey or Carter, who were photographed at the vigil. Two days after the vigil, Dorsey discharged the firearm yet again at a hookah lounge. The jury convicted defendants of 12 charged offenses, including conspiracy to commit murder, murder, attempted murders, and assaults, and found true various firearm enhancements.

On appeal, defendants claim the trial court erroneously admitted evidence of the uncharged shooting incidents because the evidence was irrelevant and prejudicial. They further claim the court should have stayed their sentences for conspiracy to commit murder, or erred in imposing the attendant firearm enhancement, under Penal Code section 654.[1] Finally, defendants assert several other sentencing errors, which the People concede must be corrected.

We conclude the trial court did not err in admitting evidence of the uncharged shooting incidents or in imposing enhanced sentences for the conspiracy offense under section 654. We accept the People's concession on

_____

[1] Further unspecified statutory references are to the Penal Code.

2

other sentencing errors and remand the judgment with directions.  In all other respects, the judgment is affirmed.

*Gang background*

Dorsey and Carter were active members of West Coast Crips (Crips), a gang that primarily engaged in criminal activities like homicides, shootings, stabbings, robberies, selling drugs, and possessing firearms.  Crips were rivals to Blood set gangs, which included 5/9 Brim and Lincoln Park.  Each of these gangs claimed distinct geographic territory, markers, and colors as its own.  For instance, Crips identified by blue, while Lincoln Park identified by green.

Like other gangs, Crips adhered to certain principles and a hierarchy.  Members were expected to "put[] in work" for the gang, i.e., engage in crimes, protect the gang's territory, and retaliate against rival gang members.  Crips identified with the numbers "3" and "0," corresponding to their territory around 30th Street.  Crips further expected members to engage in violent crimes against rival gangs in March, culminating on March 30; the gang referred to this period of escalated violence as "March Madness."

Dorsey and Carter used social media to broadcast their gang affiliation and communicate with other gang members.  Dorsey was also known as Mr. Perfect and Young Holly Fu, and Carter was also known as Ike Turner and Tidy Bo.  Records of their social media use were admitted in evidence, showing that defendants posted pictures, videos, and/or comments on their and their friends' pages, and these posts could be seen by hundreds of other

---

[2]    Although defendants appealed the judgments in several cases, the issues on appeal pertain only to case number SCD268251.  We limit our factual background accordingly.  Unspecified date references are to 2016.

friends and users. Defendants additionally used private messaging and voice call functions.

*Between January and March, defendants conspire to*
*murder rival gang members (count 1)*

On January 19, Dorsey posted a picture on his social media page that showed him and Carter displaying Crips' hand signs in front of the Lincoln Park fire station sign. The picture was captioned, "Oh we out thuggin." Defendants' actions were highly disrespectful to Lincoln Park, taunting or challenging the rival gang to respond violently.

The following day, someone fired a gun at Carter's home. No culprit was identified, but Carter believed a Lincoln Park gang member was responsible.

Subsequently, on numerous days in January, February, and March, Dorsey and Carter exchanged private messages with other individuals, seeking to obtain firearms and ammunition. As mere examples, on January 26, Carter messaged one individual, "I need some bullets LOL" and "Who got them, LOL. I need a thang [(handgun)] too." The individual messaged Carter back with a photograph of a gun, to which Carter responded, "How much you want for it. I need it RN [(right now)]." On February 2, in an exchange with a different person, Dorsey wrote, "I'm a by a [9] [and 2 ]380," (*sic*) referencing types of guns. On March 4, Dorsey messaged someone else, "Cuete" (Spanish slang for gun), and "I got 250 to 300, what can I get . . . ASAP."

During this time period, defendants presented themselves to the outside world as Blood killers ("BK") and slob killers ("SLOBK"), with "slob" being a derogatory term for Blood gang members. In March, Dorsey and Carter were involved in several shooting incidents.

4

*March 9, shooting at Ocean View liquor store (counts 6-12)*

On March 9, around 6:00 p.m., Reality Robinson and her friend (Holiday) picked up Carter and Dorsey in a maroon, four-door Honda Accord. These four were a tightknit group. Robinson drove the car, Dorsey sat in the backseat behind her, Holiday was in the front passenger seat, and Carter sat in the backseat behind Holiday.

According to Robinson, Dorsey instructed her to exit the freeway at Ocean View Boulevard. Robinson noticed a black handgun in Carter's lap, and she was directed to turn off her cell phone. She drove past a liquor store on Ocean View, known to be a 5/9 Brims' hangout spot in that gang's territory. Dorsey or Carter pointed out a man who looked like he could be a "patrol" for 5/9 Brims. Robinson turned the car around, and on this cruise past the liquor store, Carter called out, "West Side," and fired seven or eight shots out of his window toward the liquor store.

Sixty-year-old victim Michael,[3] who was about to enter the only entrance of the liquor store, was shot in the back of his left leg, through and through. His thigh bone was broken, and there was a "hole" in his knee joint. Michael immediately fell, managed to crawl inside the liquor store, and told the cashier to call for help. He required surgery, over 40 days of convalescence, and still could not run properly two years afterward.

A neighborhood family, comprised of a father, 15-year-old boy, and 10-year-old girl, had finished buying a snack in the liquor store. As they were exiting the store, the father heard multiple gunshots and saw a man shooting a gun out a window of the maroon car. The terrified family took cover by

---

[3]     We refer to some victims by their first names for clarity and privacy purposes. No disrespect is intended.

squeezing themselves in a space by an outdoor ice refrigerator. The father later provided a description of the shooter to police.

The inside of the store was hit by bullets. The cashier, who ducked below the counter during the shooting, called 911 at approximately 6:53 p.m., initiating emergency and law enforcement responses. Surveillance footage showed shots fired from the back seat of the maroon car. The surveillance video also showed an unidentified male victim standing outside the liquor store during the gun fire.[4] Police recovered cartridge casings and bullet fragments. The casings were subsequently found to have been fired from the same gun as casings recovered from multiple other crime scenes.

*March 9, next shooting on Manomet Street (counts 2-5)*

The group in the maroon car made a quick stop at Carter's grandmother's house. There, Robinson used the restroom. When the group ventured back out, she was in the driver's seat, Dorsey sat in the front passenger seat, and Carter and Holiday sat in the back.

As directed by defendants, Robinson drove to a block of Manomet Street in Lincoln Park territory, less than two miles away from the Ocean View liquor store. Dorsey or Carter observed a group of men—victims Johnnie Horne (Horne), Samuel, and Brandon—standing in the driveway of Brandon's house. Dorsey indicated to Robinson to turn off the car's headlights and stop at the house; she complied and stopped about 20 feet from the group of men. Horne was wearing a green sweatshirt, commonly associated with Lincoln Park.

The men in the driveway were childhood friends, and they had been chatting for a little while as they commonly did. Brandon's mother sat in the

---

[4]    Michael testified that the unidentified man might be named "Chris."

garage, playing a game on her phone. Brandon, who was a car hobbyist, noticed the maroon, four-door, late 1990's Honda Accord stop in front of his house. He believed the driver was female. A male matching Dorsey's description exited the front passenger door,[5] said something to the effect of "what's happening," and began shooting at the group of friends. They tried to run inside for cover.

Horne was shot in the head and died from his wound. Samuel was shot in the leg, which "shattered." Brandon narrowly escaped the gun fire. His mother safely reached the inside of her home. The next door neighbor, who heard the gunshots, called 911 at 7:20 p.m., or less than 30 minutes after the liquor store shooting.

According to Robinson, Dorsey fired "about five or six" shots toward the house and got back in her car. They drove off. Robinson recalled an atmosphere of "excitement" among her friends inside the car. One of the defendants declared, " 'That nigga dropped.' "

Detectives collected six cartridge casings at the Manomet Street shooting, which were later analyzed and tied to casings from other crime scenes.[6]

---

[5] Both Dorsey and Carter are six feet tall men of the same race; however, Dorsey weighs 180 pounds while Carter weighs 280 pounds. The surviving witnesses described the shooter on Manomet Street as ranging from 175 to 210 pounds and nowhere close to 280 pounds. Robinson testified that Carter and Dorsey, respectively, were the triggermen on Ocean View and Manomet Street, respectively.

[6] We omit the facts relating to a third shooting incident on the evening of March 9. The victim of that shooting refused to cooperate with law enforcement, and Dorsey, who was charged with a crime in connection with the incident, was acquitted by the jury (count 13).

*March 10 shooting at vigil for deceased fellow gang member Coney*
*(alleged as overt act #20 supporting murder conspiracy)*

The day after the shootings, on March 10, a candlelight vigil was held for Jason Coney, a deceased former Crips member. Carter and Dorsey were photographed at the vigil along with a few other gathered Crips, and the photograph was subsequently posted on social media. During the vigil, gunshots were fired at the group of attendees, and one or more Crips returned fire. Officers responded and obtained surveillance footage, which showed the vigil attendees scattering and running away at the sound of gunfire. Officers were able to collect cartridge casings at the scene, which were compared to casings collected from the Ocean View, Manomet, and other crime scenes. It was later determined that the same gun used in the Ocean View and Manomet shootings was fired at the Coney vigil.

*March 12 shooting at hookah lounge*

Two days after the vigil, on March 12, Robinson, Holiday, another female friend (Pittman), Carter, and Dorsey rode in Pittman's vehicle to a hookah lounge. They parked in a lot across the street, where cars and "a lot of people" were gathered. While she was still in the vehicle, Robinson saw two men in the car next to her pull a gun out of their trunk. She then heard gunshots and observed Dorsey "shooting back." Pittman also heard gunshots and, in a subsequent text message describing what had happened, wrote that "Fu shot back," referring to Dorsey's alias, Young Holly Fu. Pittman and her group drove off. The rear window of Pittman's vehicle was shot out during the incident.

Police responded to a report of gun fire. There were no apparent victims. Officers observed glass fragments in a parking spot and collected cartridge casings, later determined to be fired from the same 9mm gun as the one used in the Ocean View, Manomet, and Coney vigil shootings.

8

*March 19 shooting on Island Avenue*
*(alleged as overt act #23 supporting murder conspiracy)*

On March 19, victim Shaun attended a house party on Island Avenue in Crips territory, where several Crips members, including defendants, were in attendance. Outside the house, a "gang banging" man hit Shaun, who hit him back in self-defense. As he ran away from the area, Shaun was shot several times, twice in the chest and once in the leg, and went unconscious in his friend's car from blood loss. He required life-saving medical treatment.

Shaun claimed not to know who shot him. Five cartridge casings found at the Island Avenue crime scene were determined to have been fired from a different 9mm gun than the one used in the other shootings. One of the recovered casings from Island Avenue contained Dorsey's DNA.

*Police investigations and other evidence*

Police investigations ensued after each of the shooting incidents. Officers conducted witness interviews, collected physical evidence for forensic examination, analyzed cell and other electronic records, and executed search warrants on relevant homes and vehicles.

In Dorsey's bedroom, officers found three live 9mm rounds, two magazines for a Glock handgun, SLOBK t-shirts, and paperwork containing Dorsey's and Carter's names. A box of .40-caliber ammunition was found elsewhere in Dorsey's home. One of the 9mm rounds found in Dorsey's bedroom bore a PPU head stamp, while two of the rounds bore Blazer head stamps.

Firearms experts analyzed casings recovered from the Ocean View, Manomet, Coney vigil, and hookah lounge shooting scenes, and determined that the casings were (1) fired from the same 9mm gun; and (2) consistent with being fired from a Glock pistol. That gun—the crime weapon—was not recovered. Some casings found at the Ocean View, Manomet, and Coney vigil

shootings bore PPU head stamps, while casings found at the Island Avenue shooting bore Blazer head stamps. The Island Avenue shooter used a different 9mm firearm than what was used in the previous shootings.

Investigators extensively reviewed defendants' and their associates' social media activities and online communications, which disclosed relevant evidence of a gang-related conspiracy.

Robinson was arrested. She ultimately agreed to plead guilty to certain charges and testify for the prosecution in exchange for a more lenient sentence. Robinson's account of events was corroborated by various evidence as we have referenced, as well as cell phone records showing her movements and communications on the day of the March 9th shootings.

*Superior court proceedings*

Defendants were charged with conspiracy to commit murder, i.e., to "kill suspected rival gang members, including those from the Lincoln Park and 5/9 Brim criminal street gangs" (§§ 182, subd. (a)(1), 187; count 1); murdering Horne (§ 187, subd. (a); count 2); three counts of attempted murder as to Samuel, Brandon, and Michael (§§ 664, 187, subd. (a), 189; counts 3, 4, & 6); shooting at an inhabited dwelling on Manomet (§ 246; count 5); shooting at an occupied building on Ocean View (§ 246; count 7); discharging a firearm from a motor vehicle (§ 26100, subd. (c); count 8); and four counts of assault with a semiautomatic firearm as to the father, his two children, and the unidentified man at the liquor store (§ 245, subd. (b); counts 9, 10, 11, & 12). Dorsey was charged with one additional count of assault with a semiautomatic firearm (§ 245, subd. (b); count 13).

The charging document expressly alleged 23 overt acts performed between January 21 and March 20 in furtherance of the conspiracy to commit murder; some of the overt acts were charged crimes while others were not.

10

The People alleged that all the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1), (4), & (5)). They further alleged firearm enhancements as to all counts (§§ 12022, subd. (a)(1), 12022.5., subd. (a), 12022.53, subds. (b)-(e)(1)). Dorsey was alleged to have inflicted great bodily injury during the commission of counts 3, 5, and 13 (§ 12022.7, subd. (a)), and Carter was alleged to have inflicted great bodily injury during the commission of counts 8, 9, 10, 11, and 12 (§ 12022.7, subd. (a)).

A joint trial was held in October and November 2018. During motions in limine, defendants sought to exclude evidence of the uncharged shootings at the Coney vigil and hookah lounge. As discussed further, *post*, the trial court denied defendants' request and allowed the jury to hear evidence of these shootings.

Evidence at trial revealed the summarized facts described herein, with Robinson's key testimony identifying defendants and their activities on the day of the charged shootings and at the hookah lounge. The jury also heard testimony from experts, including in firearms, gangs, DNA analysis, social media, and cell phone analysis. Various witnesses, including some victims, were recalcitrant and reluctant to testify against defendants. For example, victim Samuel testified that he would not tell police who shot his friend even if he knew who did it, for fear of violent retaliation. As a further example, although Pittman was with defendants on the night of the hookah lounge shooting, she claimed at trial to have "no idea" who they were.

Before the case was sent to the jury, the prosecutor dismissed the section 12022.5, subdivision (a), enhancement, alleged as to Dorsey's counts 3 and 4 and Carter's count 6, because they were "duplicative" of the section 12022.53 enhancements. The prosecutor also moved to dismiss the section 12022, subdivision (a)(1), arming enhancement alleged as to Dorsey's counts

11

9, 10, 11, and 12. During deliberations, after a charging error was discovered, the prosecutor further dismissed the section 12022.7 allegation attached to Dorsey's count 5.

The jury acquitted Dorsey of count 13 but convicted defendants of all other counts and found all remaining allegations true.

In case number SCD272022, a jury convicted Dorsey of two counts of burglary of an inhabited dwelling (§§ 459, 460, subd. (a)). In case number SCD266202, Dorsey pleaded guilty to one count of felony assault and admitted a gang enhancement (§§ 245, subd. (a)(1), 186.22, subd. (b)(1)). In case number SCD276978, Carter pleaded guilty to one count of burglary of an inhabited dwelling (§§ 459, 460, subd. (a)). Sentencing for all cases occurred at the same hearing.

The court sentenced Carter to a consecutive term of 247 years to life plus seven years calculated as follows on these counts: (Count 1) 25 years to life plus 25 years to life for a firearm enhancement (§ 12022.53, subds. (d) & (e)(1)); (Count 2) 25 years to life plus 25 years to life for a firearm enhancement (§ 12022.53, subds. (d) & (e)(1)); (Count 3) seven years to life plus 25 years to life for a firearm enhancement; (Count 4) 15 years to life; (Count 5) seven years; (Count 6) 15 years to life plus 25 years to life for a firearm enhancement; (Count 7) 15 years to life; (Count 9) 15 years to life; (Count 10) 15 years to life; and (Count 11) 15 years to life. The sentence on count 12 was ordered concurrent, and the court struck or stayed remaining counts and enhancements. The court further imposed a two-year concurrent term for Carter for his separate burglary conviction.

The court sentenced Dorsey to a consecutive term of 202 years to life plus 24 years and eight months calculated as follows on these counts: (Count 1) 25 years to life plus 25 years to life for the firearm enhancement

12

(§ 12022.53, subds. (d) & (e)(1)); (Count 2) 25 years to life plus 25 years to life for the firearm enhancement (§ 12022.53, subds. (d) & (e)(1)); (Count 3) 15 years to life plus 25 years to life for the firearm enhancement; (Count 4) 15 years to life; (Count 5) 15 years to life; (Count 6) seven years to life plus 25 years to life for the firearm enhancement; (Count 7) one year and eight months; (Count 9) nine years plus five years for the gang enhancement and one year for the personal injury enhancement; (Count 10) two years plus one year and eight months for the gang enhancement plus four months for the personal injury enhancement; and (Count 11) two years plus one year and eight months for the gang enhancement plus four months for the personal injury enhancement. The sentence on count 12 was ordered concurrent, and the court struck or stayed remaining counts and enhancements.

As to Dorsey, the court additionally imposed two four-year concurrent terms for his two burglary convictions and a four-year concurrent term for his assault conviction plus five years for a gang enhancement, stayed.

Defendants' appeals followed.

## DISCUSSION

I. *The Trial Court Did Not Err in Admitting Evidence of Uncharged Shooting Incidents*

Defendants claim the trial court prejudicially erred in admitting evidence of uncharged shooting incidents that took place on (1) March 10 at the Coney vigil, which was alleged as an overt act in furtherance of the murder conspiracy; and (2) March 12 at the hookah lounge.

A. *Additional Background*

During motions in limine, the People sought to admit evidence of the uncharged shooting incidents, while defendants sought to exclude them. The court and counsel engaged in a lengthy colloquy in which both events were

13

discussed, and defense counsel repeatedly objected to admission of the evidence on various grounds.

The People argued that the Coney vigil shooting was alleged as an overt act in furtherance of, and directly evidenced, defendants' conspiracy to commit murder, and was thus relevant to prove a charged offense. Further, the People posited that evidence of both uncharged shootings was admissible and relevant under Evidence Code section 1101, subdivision (b), to prove identity, intent, and/or motive. The prosecutor explained how the unrecovered 9mm gun used in each shooting was fired in at least four distinct locations in a short period of time, and defendants were present each time when the gun was fired. Citing *People v. Erving* (1998) 63 Cal.App.4th 652 (*Erving*), the prosecutor argued that evidence of defendants' involvement in the uncharged shootings tended to prove that defendants were the shooters on the night of the charged offenses.

Defense counsel asserted that evidence of the uncharged shootings was irrelevant, prejudicial, and would merely portray defendants as violent people. Regarding the Coney vigil shooting, counsel argued that the prosecution should not be allowed to selectively allege overt acts in order to present unduly prejudicial character evidence, that is, use a "backdoor approach." In addition, defense counsel argued that the uncharged shootings were not similar to the charged shootings and that defendants arguably acted in self-defense at the hookah lounge.

Both the prosecution and defense argued for and against admitting the evidence under Evidence Code section 352. Dorsey's counsel requested that evidence of Coney's manner of death be "sanitized" so that there would be no references to him being murdered.

14

The trial court admitted the evidence but excluded the manner of Coney's death. The court believed that the vigil shooting was admissible as evidence of a conspiracy and that both uncharged incidents were relevant to issues of identity and intent. After conducting a weighing process, the court found the evidence more probative than prejudicial under Evidence Code section 352.

Finally, prior to deliberations, the jury was instructed with CALCRIM No. 375 as follows in pertinent part: "If you decide that the defendant committed the uncharged act, you may, but are not required to, consider that evidence for the *limited purpose* of deciding whether: [¶] The defendant was the person who committed the offenses alleged in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged act and the charged offenses. [¶] *Do not consider this evidence for any other purpose.* [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the act, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty . . . ." (CALCRIM No. 375, italics added.)

B.    *Legal Principles*

All relevant evidence is admissible unless excluded under the state or federal constitutions or by statute. (*People v. Heard* (2003) 31 Cal.4th 946, 973.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Heard,* at p. 973.)

Evidence of uncharged crimes or other misconduct is inadmissible when offered to show that a defendant has a criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a).)

15

However, evidence of other crimes is admissible if it tends to " 'logically, naturally, and by reasonable inference . . . establish any fact material for the people[.]' " (*People v. Peete* (1946) 28 Cal.2d 306, 315.)  Evidence Code section 1101, subdivision (b), codifies this exception to the general rule of inadmissibility by providing for the admission of such evidence "when relevant to prove some fact . . . such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident[.]"

"To be relevant to prove identity, the uncharged crime must be highly similar to the charged offenses, while a lesser degree of similarity is required to establish relevance to prove common design or plan, and the least similarity is required to establish relevance to prove intent." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123-1125 (*Lenart*) [gun-related evidence was admissible to link defendant to other incriminating evidence and was relevant to showing his identity as the murderer]; *Erving, supra,* 63 Cal.App.4th at p. 661 [defendant's proximity to nearly 40 other arsons provided a "signature" required for uncharged fires to be relevant to prove her identity as the arsonist in charged fire].)

The trial court has the discretion to exclude relevant evidence if the court finds the probative value is substantially outweighed by the probability the evidence will "create substantial danger of undue prejudice." (Evid. Code, § 352; *Lenart, supra*, 32 Cal.4th at p. 1123.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely

16

tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

We review the court's evidentiary rulings for abuse of discretion. (*Lenart, supra*, 32 Cal.4th at p. 1123.)

C. *Analysis*

1. *Relevance*

Defendants primarily argue that the uncharged shooting incidents were not sufficiently similar to the charged shootings to be relevant to prove identity.[7] We conclude that evidence of the uncharged shooting incidents was relevant to prove various disputed material facts, including the shooters' identities.

Because cartridge casings from the charged and uncharged shootings were determined to have been from the same weapon, the jury could reasonably infer that defendants possessed the unrecovered crime weapon (9mm gun) one and three days after the charged crimes, tending to logically show that defendants possessed the gun on the day of the charged crimes. (*People v. Cooks* (1983) 141 Cal.App.3d 224, 316 (*Cooks*) [uncharged crimes relevant and admissible where same gun was used in charged crimes]; *People v. Goss* (1980) 105 Cal.App.3d 542, 548.) The actual 9mm gun was not recovered. It could also be reasonably inferred that defendants were on a

---

7     We reject the People's threshold argument that defendants forfeited their evidentiary challenge by failing to renew their objections during trial. Defendants repeatedly objected to admission of the evidence during motions in limine, and the record supports that any further objections on the issue would have been futile. (See *People v. Hill* (1998) 17 Cal.4th 800, 821.) Defendants have joined each other's arguments on appeal.

17

shooting spree, given their repeated discharge of the 9mm gun in the days after the charged shootings.

Moreover, the doctrine of chances "applies to evidence of identity." (*Erving, supra*, 63 Cal.App.4th at p. 662.) Under this doctrine, " 'highly unusual events' " are highly unlikely to repeatedly happen to an innocent person. (*Ibid.*) We are persuaded in this case that defendants' presence at the exact time when the 9mm gun was discharged, in four separate locations, all in a relatively short timeframe, lent to the reasonable inference that defendants were the shooters during the charged crimes. Defendants were together at each location, and, uniquely, they were the only ones who were present at *all* locations. They had gang-related motivations to engage in each shooting. Robinson was present at three of the four locations, and she confessed her guilt.

In addition, the prosecution relied on Robinson's testimony to identify defendants as the shooters, but her credibility was questionable as an accomplice with a plea deal. Photographic and forensic firearms evidence relating to the Coney vigil bolstered Robinson's identification because it independently placed the 9mm gun in defendants' proximity on the day after the charged crimes. Likewise, another witness (Pittman) confirmed the occurrence of a shooting at the hookah lounge, further bolstering Robinson's credibility. The uncharged incidents supported Robinson's testimony and the prosecution's theory that defendants were engaged in an ongoing violent feud with rival gang members, dubbed "March Madness." The uncharged incidents were therefore also relevant to prove intent and motive.

Defendants argue that guns are routinely passed among gang members, and as such, the situation could have been that someone other than defendants committed one or both of the charged shootings on March

18

9th and then passed the 9mm gun to defendants by the time of the next shooting or next day, and defendants then used the gun in subsequent shooting incidents. While this conceivably could have occurred, it was "highly unlikely" in light of other evidence. (*Erving, supra*, 63 Cal.App.4th at 662). The jury would have had to reject most of Robinson's testimony, which was independently corroborated in many ways, including through cell phone evidence, text messages, surveillance footage, and eyewitness observations about her maroon car and the shooters' attributes. The jury obviously believed Robinson. Furthermore, as instructed, the jury was not required to consider any uncharged act on the issue of identity; it was free to draw the inference advocated by defendants.

Regarding the Coney vigil shooting, it was alleged as an overt act in furtherance of the charged conspiracy to commit murder. Defendants claim the incident was not properly alleged as an overt act and thus, not relevant to the charged offenses.[8] We conclude the court did not err.

"In California, 'No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement[.]' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1131.) Because the prosecution is required to prove at least

---

[8] Defendants also argue the trial court should have stricken the overt act from the charging document pursuant to section 1385. However, this argument has not been properly preserved for appellate review. In the context of motions in limine, defense counsel asserted that the overt act should be "stricken." At that point, the court interjected that it did not believe it had the power to "change any of the indictment" and "that's a 995," i.e., a section 995 motion to dismiss. Defendants do not point us to any part of the record where a motion to dismiss was ever filed on the issue and accordingly, the argument is forfeited. In any event, for reasons we discuss herein, we do not see how the trial court erred in allowing the overt act to remain in the charging document.

one overt act, evidence of those acts is undoubtedly relevant. (§ 182, subd. (b) ["Upon a trial for conspiracy, . . . the defendant cannot be convicted unless one or more overt acts are expressly alleged . . . nor unless one of the acts alleged is proved . . . ."]; *People v. Russo*, at p. 1134 ["the requirement of an overt act is an element of the crime of conspiracy in the sense that the prosecution must prove it to a unanimous jury's satisfaction beyond a reasonable doubt"].)

In this case, the People alleged an ongoing conspiracy between January 21 and March 20, by defendants and other coconspirators, to kill suspected rival gang members. During pretrial motions, the prosecutor offered to prove that a group of Crips gathered on March 10 at the vigil for a deceased fellow gang member and, during the vigil, defendants engaged in a shootout with rival gang members. Defendants were therefore arguably furthering the objective of the conspiracy. The trial court did not abuse its discretion in allowing the People to introduce evidence of this overt act, which remained explicitly alleged in the charging document, even if in defendants' view the People fell short of meeting their burden of proof. The more pertinent issue seems to be whether the trial court should have excluded evidence of the overt act and the hookah lounge shooting as unduly prejudicial, discussed below.

### 2. *Undue prejudice*

In evaluating other crimes evidence, a court must consider (1) the materiality of the fact to be proved; (2) the probative value of the other crime evidence to prove the fact; and (3) the existence of any rule or policy requiring exclusion. (*People v. Hawkins* (1995) 10 Cal.4th 920, 951.) Under Evidence Code section 352, the court "in its discretion may exclude evidence if its

20

probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice[.]"

On this record, we discern no abuse of trial court discretion in admitting evidence of the uncharged shooting incidents. The trial court explicitly engaged in a weighing process. One of the main issues in dispute was the shooters' identity, and the uncharged incidents were relevant to that issue as well defendants' intent, motive, and Robinson's credibility. The probative value of the uncharged incidents was high when viewed together with forensic evidence and as corroborative of Robinson's testimony. The uncharged shootings were not inflammatory in comparison to the charged shootings, as defendants acknowledge. Given that defendants arguably acted in self-defense at one or both of the uncharged shootings, the likelihood of those incidents evoking an " 'emotional bias' " against defendants was quite low. (*People v. Robinson* (2005) 37 Cal.4th 592, 632.)

Defendants assert the uncharged incidents allowed the jury to infer that they were violent, dangerous people prone to using firearms. However, the jury could draw that inference from unchallenged evidence of the charged crimes, witnesses' hesitancy to testify against defendants, and evidence showing that they were acting for the benefit of a criminal street gang. Moreover, the jury was instructed to consider the uncharged acts, if at all, for the limited purpose of deciding whether defendants were the ones "who committed the offenses alleged in this case" and not for "any other purpose." We presume the jury followed these instructions. (*People v. Williams* (2000) 79 Cal.App.4th 1157, 1171 ["we presume jurors are able to and do follow the court's limiting instructions"].)

For the foregoing reasons, we conclude defendants have not shown the court exercised its discretion to admit the challenged evidence " ' "in an

21

arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 330.)

II.    *The Trial Court Did Not Err in Imposing Enhanced Sentences for Conspiracy to Commit Murder*

As to both defendants, the trial court imposed 25 years to life on count 2 for Horne's murder, plus 25 years to life for the true-found firearm enhancement.  In addition, the court imposed 25 years to life on count 1 for conspiracy to commit murder, plus 25 years to life for the true-found firearm enhancement.  The court found the object of defendants' conspiracy was not limited to the murder of Horne but extended to other people and potential rival gang members.  The sentences on counts 1 and 2 were ordered to run consecutive to each other.

Defendants argue that their sentence on the conspiracy count should be stayed pursuant to section 654.  Alternatively, defendants assert the sentence for the firearm enhancement on count 1 should be stayed.  We conclude the court did not err in imposing an enhanced sentence.

A.    *Multiple Punishment was Proper*

Section 654 "concerns only multiple punishment, not multiple convictions."  (*People v. Correa* (2012) 54 Cal.4th 331, 336.)  The "purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability."  (*Id*. at p. 341.)

It is violative of section 654 " 'to sentence a defendant for conspiracy to commit several crimes and for each of those crimes where the conspiracy had no objective apart from those crimes.  If, however, a conspiracy had an objective apart from an offense for which the defendant is punished, he may properly be sentenced for the conspiracy as well as for that offense.' "  (*People v. Flores* (2005) 129 Cal.App.4th 174, 185.)  When a defendant conspires to murder someone, and murders that same person, the defendant may not be

22

punished for both conspiracy and murder. (E.g., *People v. Vu* (2006) 143 Cal.App.4th 1009, 1012, 1032-1033 [section 654 stay required where defendant conspired to kill, and killed, Fernandez as a mistaken rival gang member].) However, when a defendant conspires to murder one or more people, but murders a different person, he may be punished for both conspiracy and murder. (E.g., *People v. Moringlane* (1982) 127 Cal.App.3d 811, 819 [conspiracy to murder Silva and Rico, but McDowell was murdered].)

In *People v. Beck and Cruz* (2019) 8 Cal.5th 548 (*Beck and Cruz*), our Supreme Court noted that the conspiratorial murder agreement had a broader objective than the murders for which defendants were being punished, that is, the "conspiracy to commit murder was not limited to the actual victims killed, but rather included anyone found at [a specified address] and any witnesses." (*Id.* at pp. 665-666 [multiple punishment permitted under section 654]; see also *Cooks, supra,* 141 Cal.App.3d at p. 317 [multiple punishment permitted where "the alleged conspiracy was not limited to the murder of Frances Rose but extended to the murder of a number of other people"]; *People v. Lewis* (2008) 43 Cal.4th 415, 539 [multiple punishment not permitted because "there was no showing that the object of the conspiracy was any broader than commission of the underlying crimes"].)

The question of defendant's conspiratorial intent or objective is generally a factual one. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive offense that is the object of the conspiracy." (*People v. Swain* (1996) 12 Cal.4th 593, 599-600.) Evidence of a conspiracy is "sufficient if it supports an inference that the parties positively *or tacitly came to a mutual understanding to commit a crime*. Therefore, conspiracy

23

may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399, italics added.)

As alleged and established by the evidence in this case, the objective of defendants' conspiracy was "to kill suspected rival gang members, including those from the Lincoln Park and 5/9 Brim criminal street gangs." Defendants did not conspire to kill a specified person, and killing Horne arguably fell within the ambit of their objective. However, as in *Beck and Cruz*, *supra*, 8 Cal.5th at page 666, the conspiracy here was "not limited to the actual victim[] killed, but rather included" a number of other people. The trial court found that the object of the conspiracy extended beyond Horne's murder. Indeed, with "March Madness" as the backdrop, defendants acquired more than one firearm and ammunition and shot at multiple people over several days.

Likewise, the conspiracy was ongoing, i.e., the agreement to kill suspected rival gang members existed even after Horne was murdered. For instance, victim Shaun was shot three times—twice in the chest—after scuffling with a Crips member at an Island Avenue house party on March 19. Remarkably, Shaun survived. Dorsey's DNA was found on an Island Avenue cartridge casing, the same 9mm Blazer-brand casings used in the shooting were found in his bedroom, and defendants were not separately punished for their conduct in this crime. Their culpability went beyond that of conspiring to murder one person. Commensurately, they could be punished for both counts 1 and 2. (*Beck and Cruz*, *supra*, 8 Cal.5th at p. 666; see also *People v. Kopp* (2019) 38 Cal.App.5th 47, 92 [approving multiple punishment where

there were time gaps between various alleged overt acts, providing defendant time to reflect and making her actions divisible].)

B.    *Firearm Enhancement on Count 1 was Proper*

Alternatively, defendants claim the trial court erred in imposing the firearm enhancement on count 1 (§ 12022.53, subds. (d) & (e)(1)) because a firearm enhancement was also imposed on count 2 in connection with Horne's murder.  As to both defendants, the jury made a true finding that, in the commission of the conspiracy, "at least one principal personally and intentionally discharged a firearm . . . and proximately caused great bodily injury and death to a person . . . ."

Section 12022.53, subdivision (d), provides in part that, "[n]otwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a) . . . intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Conspiracy to commit murder is a qualifying felony.  (§§ 12022.53, subd. (a)(17) [qualifying felonies includes those punishable by death or imprisonment for life], 182, subd. (a) [conspiracy is punishable in the same manner and to same extent as the target felony], 190, subd. (a) [first degree murder is punishable by death or imprisonment for life]; *People v. Becker* (2000) 83 Cal.App.4th 294, 298 (*Becker*) [firearm enhancement applied to underlying felony of conspiracy].)

Section 654 does not preclude punishment for more than one section 12022.53 firearm enhancement when each is based on a single act committed against a single victim in the commission of separate crimes.  (*People v. Palacios* (2007) 41 Cal.4th 720, 726-727 (*Palacios*).)  In *Palacios*, the

25

California Supreme Court approved firearm enhancements for attempted murder, kidnapping for carjacking, and kidnapping for robbery, based on a single gunshot to one victim. The court noted, "[w]hen defendant shot Jones, attempting to kill him, the kidnapping offenses were still ongoing." (*Id.* at p. 726.) As construed, section 12022.53 applies " 'notwithstanding any other provision of law,' " or irrespective of section 654. (*Palacios*, at pp. 728-729.)

Applying *Palacios*, we conclude the firearm enhancements for conspiracy and murder could be based on a single gunshot causing Horne's death. Conspiracy is a "classic example of a continuing offense because by its nature it lasts until the final overt act is complete." (*Becker*, *supra*, 83 Cal.App.4th at pp. 297-298.) As in *Palacios*, when Horne was shot and killed, the conspiracy offense was still ongoing. By finding the section 12022.53, subdivisions (d) and (e)(1) enhancement allegations to be true, the jury determined that a principal fired a gun and caused great bodily injury and death during the commission of both offenses. The firearm enhancement applies to qualifying felonies "notwithstanding any other provision of law," or irrespective of section 654. Accordingly, the court did not err in imposing the firearm enhancement on count 1. (Cf. *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1220-1221 [section 654 applied to enhancement for personally using a deadly or dangerous weapon during a crime but the relevant enhancement under section 12022, subdivision (b) does not contain "notwithstanding any other provision of law" language].)

Defendants finally argue they did not have fair notice of the punishment for a firearm enhancement on the conspiracy count. However, in the charging document, the section 12022.53 firearm enhancement for count 1 is listed as a "special allegation" in the charge summary, which also states the "allegation effect" of "+25 Yrs-Life." The same is true for count 2. The

firearm enhancements are additionally detailed in paragraph form under counts 1 and 2.  As we have already noted, the charging document specifically alleged 23 overt acts and the object of the conspiracy.  Defendants had adequate notice that count 1 was subject to a firearm enhancement, which carried an additional sentence of 25 years to life.  Accordingly, their due process argument lacks merit.

III.  *Other Conceded Sentencing and Clerical Errors Must Be Corrected*

 A. *Dismissed Allegations of Enhancements Must Be Stricken and Abstract of Judgment Corrected*

Before the case was sent to the jury for deliberations, the prosecutor dismissed the alleged section 12022.5, subdivision (a) enhancement as to Dorsey's counts 3 and 4 and Carter's count 6.  The prosecutor also moved to dismiss the alleged section 12022, subdivision (a)(1), arming enhancement as to Dorsey's counts 9, 10, 11, and 12.  Later, the prosecutor further dismissed the section 12022.7 allegation attached to Dorsey's count 5.  The jury made no findings on these dismissed allegations.

Nevertheless, the trial court imposed but stayed a 10-year term for the section 12022.5, subdivision (a) enhancement on Dorsey's count 3 and Carter's count 6.  The court also imposed sentences for the arming enhancement (§ 12022, subd. (a)(1)) on Dorsey's counts 9 through 12, respectively, of one year consecutive, four months consecutive, four months consecutive, and one year concurrent.

The People concede the trial court's error, and we accept the concession.  The sentences were unauthorized and will be corrected.  (*People v. Turner* (2002) 96 Cal.App.4th 1409, 1414-1415.)

In addition, Dorsey points out that his abstract of judgment must be corrected to accurately reflect the judgment against him.  The People rightly agree.  Defendants' abstracts currently show the allegations we have

27

referenced were stricken or stayed by the court when they were in fact dismissed by the prosecutor. As to Dorsey's counts 3, 4, and 9 through 12, and Carter's count 6, the abstracts must be corrected to accurately reflect the prosecutor's dismissal of the allegations (§§ 12022.5, subd. (a), 12022.7).

B. *Carter's 15-year Parole Eligibility for Count 2 Must be Stricken*

The trial court imposed a 15-year minimum parole eligibility term as to Carter's count 2 pursuant to section 186.22, subdivision (b)(5). The court also imposed a firearm enhancement pursuant to section 12022.53, subdivisions (d) and (e)(1), which only required the jury to find that a "principal" discharged a firearm. No finding was ever made that Carter personally used a firearm in the commission of count 2. In these circumstances, section 12022.53, subdivision (e)(2) "prevents the imposition of the 15-year minimum term specified in section 186.22, subdivision (b)(5)." (*People v. Salas* (2001) 89 Cal.App.4th 1275, 1282.) The People concede the 15-year minimum parole eligibility requirement must be stricken, and we accept the concession.

## DISPOSITION

The portion of Dorsey's judgment that imposes a 10-year stayed term on count 3 pursuant to section 12022.5, subdivision (a), and a total of two years and eight months on counts 9 through 12 pursuant to section 12022, subdivision (a)(1), is reversed. The portion of Carter's judgment that imposes a 10-year stayed term on count 6 pursuant to section 12022.5, subdivision (a) and a 15-year minimum parole eligibility date pursuant to section 186.22, subdivision (b)(5) is reversed. The judgments are affirmed in all other respects. The clerk of superior court is to prepare corrected abstracts of judgment that accurately reflect defendants' sentences, including those matters described in part III of this opinion. A copy of the corrected abstracts

28

of judgment shall be forwarded to the Department of Corrections and Rehabilitation.

HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.